RICH, Circuit Judge.
 

 This is an interlocutory appeal certified by Judge Miller of the United States Claims Court under 28 U.S.C. § 1292(d)(2) here on petition of Yuba Natural Resources, Inc. (Yuba) presenting the question whether the taking of Yuba’s mineral rights in land owned in fee by the United States was temporary or permanent. We granted Yuba permission to take this appeal on September 23, 1986. The Claims Court, in its July 19, 1986, opinion, 10 Cl.Ct. 486, held that the United States had permanently taken Yuba’s right to mine minerals by prohibiting Yuba from mining the property in question during a period in which the United States contended that it owned the mineral rights. August 14, 1986, the Claims Court on Yuba’s motion amended its opinion and order to say that “a controlling question of law is involved” as to which “an immediate appeal ... may materially advance the ultimate termination of the litigation,” namely, whether the taking was temporary as contended by Yuba. We hold that the taking was temporary.
 

 Background
 

 The background is set out in a prior opinion by this court,
 
 Yuba Goldfields, Inc. v. United States,
 
 723 F.2d 884 (Fed.Cir.1983), whereby the Claims Court’s grant of summary judgment holding there was no taking was vacated. Briefly, the facts are that Yuba has owned and mined minerals, namely gold, on the land in question since nearly the turn of the century. Yuba received a letter from the Army Corps of Engineers, dated April 9, 1976, stating that the precious mineral rights belonged to the United States and that Yuba was prohibited thereafter from extracting minerals from the land. After years of fruitless negotiations between Yuba and the United States, Yuba sued and won quiet title to the precious mineral rights in the United States District Court for the Eastern District of California in 1981. Having appealed that decision, the United States also withdrew its appeal on January 4, 1982, and retracted its letter on January 29, 1982.
 

 Yuba then brought suit in the Claims Court alleging a nearly six-year taking and that court granted summary judgment to the United States on the ground that no taking occurred because the United States thought in good faith that it owned the mineral rights, acted in its proprietary rather than its sovereign capacity, and did not physically bar Yuba from use of the land. This court vacated the summary judgment and remanded for trial because the Claims Court’s reasons, on the record as it then stood, were irrelevant to the question whether Yuba’s mineral rights were taken, the court did not draw all inferences in Yuba’s favor, and there were material questions of fact that could only be resolved after trial. This court further remarked that if the record did not change significantly at trial, that “the scenario brings to mind the salutary view that, whatever the outcome, the United States wins when justice is done.” The court did not, however, hold that a taking occurred but left that question for decision by the Claims Court.
 

 The Claims Court’s opinion after trial was that the facts were not significantly changed from the time of reversal of summary judgment by this court, that its prior reasoning as to why a taking did not occur was flawed, and thus that the United States in fact took Yuba’s precious mineral rights. Expressing great distaste about awarding Yuba its requested $34,144,400 based on lost profits, business expectations, and other losses particular to it, the court held that it need not reach the allowa-bility of these conjectural damage claims because the taking was permanent, not
 
 *640
 
 temporary, that there was no indication at the time of the taking that it would not be permanent, and the fact that the taking ended six years later did not convert what would be a permanent taking into a temporary one.
 

 Based on a permanent taking, the Claims Court opined that the proper measure of damages would be the fair market value of the mineral rights at the time of the taking, April 9, 1976, offset by the fair market value of those rights when the prohibition against mining those minerals ended January 29, 1982. The court did not determine damages because no evidence of fair market value had been introduced by either party.
 

 Yuba wants the taking characterized as temporary because only then can it recover what it assesses to be just compensation for the loss of its mineral rights during a period in which gold prices soared far above what gold was worth at either the beginning or the end of the taking. Simply recovering the difference between the fair market values of the rights at the start and end of the taking would not take into account the steep rise in the price of gold between 1976 and 1982. Yuba claims that had it not been prohibited from mining during the relevant period, it would have mined gold and sold it for much more than it could have in either 1976 or 1982.
 

 The United States initially argues that there was no taking for the same reasons on the basis of which the Claims Court had previously granted summary judgment to the United States. Alternatively, the United States argues that the taking was permanent because, at the outset in 1976, the taking was by all appearances for all future time.
 

 OPINION
 

 A.
 
 Standard of Review
 

 The narrow question before us, whether the taking is temporary or permanent, is one of law and thus freely reviewable. We assume, for the sake of this interlocutory appeal, that the Claims Court’s finding that a taking of some sort occurred is not clearly erroneous and point out that that issue is not now before us.
 

 B.
 
 Taking
 

 The guiding precept in any just compensation case is that the person whose property has been taken be justly compensated therefor pursuant to the language of the Fifth Amendment. A judicial literalization of that precept is: “Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken.”
 
 United States v. Miller,
 
 317 U.S. 369, 373, 63 S.Ct. 276, 279-280, 87 L.Ed. 336 (1943) (footnotes omitted);
 
 See also Almota Farmers Elevator & Warehouse Co. v. United States,
 
 409 U.S. 470, 473-474, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973);
 
 San Diego Gas & Electric Co. v. San Diego,
 
 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting on other grounds).
 

 Government action other than acquisition of title through formal condemnation proceedings (eminent domain), occupancy, or physical invasion may be found to be a taking where government action has destroyed the owner’s use and enjoyment of his property thereby depriving the owner of all or most of his interest in the property (inverse condemnation).
 
 United States v. General Motors Corp.,
 
 323 U.S. 373, 378, 65 S.Ct. 357, 359-360, 89 L.Ed. 311 (1945);
 
 United States v. Causby,
 
 328 U.S. 256, 261-262, 66 S.Ct. 1062, 1065-1066, 90 L.Ed. 1206, 6 Ct.Cl. 343 (1946);
 
 United States v. Dickinson,
 
 331 U.S. 745, 750-51, 67 S.Ct. 1382, 1385-1386, 91 L.Ed. 1789 (1947);
 
 Eyherabide v. United States,
 
 345 F.2d 565, 170 Ct.Cl. 598 (1965). And “the Constitution measures a taking of property not by what a State says, or by what it intends, but by what it
 
 does.” Hughes v. Washington,
 
 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring);
 
 Yuba Goldfields,
 
 723 F.2d at 889.
 

 The following has always been apt with regard to what measure of just compensation should be used: “It is conceivable that an owner’s indemnity should be
 
 *641
 
 measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose.”
 
 United States v. Miller,
 
 317 U.S. at 373-374, 63 S.Ct. at 280. History reveals that the fair market value of real property, what a willing buyer would pay a willing seller, is just compensation where land is condemned by the United States for all time, i.e., permanently.
 
 See, e.g., United States v. General Motors,
 
 323 U.S. at 379, 65 S.Ct. at 360. The Court has recognized that temporary reversible takings should be analyzed in the same constitutional framework applied to permanent irreversible takings and has fashioned appropriate remedies.
 
 San Diego Gas & Electric Co. v. San Diego,
 
 450 U.S. at 657, 101 S.Ct. at 1307 (Brennan, J., dissenting).
 

 In
 
 Causby,
 
 the United States leased an airport for at least one year and renewable until the end of the then national emergency. The Court held that frequent low-level flights of military airplanes over a chicken farm effected a taking of an easement on the owner’s property. The Court remanded to the Court of Claims: “Since on this record it is not clear whether the easement taken is a permanent or a temporary one, it would be premature for us to consider whether the amount of the award ... was proper.” 328 U.S. at 268, 66 S.Ct. at 1069.
 

 In
 
 Kimball Laundry Co. v. United States,
 
 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), the owner’s use of its laundry was temporarily condemned for use by the Army for several renewable one-year terms. The court held that the proper standard of compensation was the rental that probably could have been obtained, and not the difference between fair market values at the commencement and cessation of the taking. As the Court stated, rental value was the measure used in two temporary taking cases prior to
 
 Kimball Laundry—United States v. General Motors,
 
 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, and
 
 United States v. Petty Motor Co.,
 
 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). Its reasoning was clear: “Indeed, if the difference between the market value of the fee on the date of the taking and that on the date of return were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker’s occupancy.”
 
 Kimball Laundry,
 
 338 U.S. at 7, 69 S.Ct. at 1438.
 

 This court has also recognized the distinction between temporary and permanent takings and the concurrent distinction between measures of compensation applicable to those two situations.
 
 Florida Rock Industries, Inc. v. United States,
 
 791 F.2d 893 (Fed.Cir.1986), involved a permanent taking of mineral rights caused by the Army Corps of Engineers’ refusal to issue a permit to Florida Rock to mine limestone on land that it had mined before. The court, comparing
 
 Kimball Laundry,
 
 stated, “in the case of a temporary taking some injury to business is allowed to be awarded, with a careful explanation that this would not be so of a permanent taking. If, therefore, the award here was for a temporary interruption of production, the rule might be different.” 723 F.2d at 903. Our predecessor court has also recognized this distinction and held that the measure of compensation in temporary taking cases is rental value.
 
 R.J. Widen Co. v. United States,
 
 357 F.2d 988, 174 Ct.Cl. 1020 (1966) (three month taking prior to irreversible permanent taking was held to be temporary) (relying on
 
 General Motors
 
 and
 
 Kimball Laundry).
 

 What happened in this case was that the United States prohibited Yuba from exercising its mineral rights by letter dated April 9, 1976, explaining that it thought that the mineral rights belonged to the United States and not to Yuba. After losing the quiet title action brought by Yuba, the United States retracted its letter of prohibition and Yuba was again free to mine after nearly a six-year interval. The government’s withdrawal of its prohibition of Yuba’s mining activities worked “an alteration in the property interest taken— from [one of] full ownership to one of temporary use and occupation.... In such cases compensation would be measured by the principles normally governing the tak
 
 *642
 
 ing of a right to use property temporarily.”
 
 First English Evangelical Lutheran Church v. Los Angeles County,
 
 — U.S. -, -, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987), (quoting
 
 United States v. Dow,
 
 357 U.S. 17, 26, 78 S.Ct. 1039, 1046, 2 L.Ed.2d 1109 (1958));
 
 see also San Diego Gas & Electric Co. v. San Diego,
 
 450 U.S. at 659, 101 S.Ct. at 1308 (Brennan, J., dissenting) (“Rules of valuation already developed for temporary ‘takings’ may be particularly useful ... for assessing the proper measure of monetary relief in cases of revocation or amendment [of the taking regulation] although additional rules may need to be developed.”) (citations to
 
 Kimball Laundry, Petty Motor, General Motors,
 
 and
 
 Miller
 
 omitted). We therefore reject the United States’ argument that because the government allegedly intended at the outset that the taking be irreversible and for all time it must be a permanent one despite the fact that it ended six years later.
 

 We also reject the Claims Court’s reasoning that the taking was permanent: “Yuba was not obligated to accept the return of the property rather than to demand just compensation therefor” and “that [Yuba] was willing to accept the return of the property rather than to insist upon just compensation, cannot be effective to change the original taking from a permanent one to a temporary taking.” 10 Cl.Ct. at 499.
 

 The Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations.
 
 See, e.g., Kirby Forest Industries, Inc. v. United States,
 
 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984);
 
 United States v. Dow,
 
 357 U.S. 17, 26, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). Similarly, a governmental body may acquiesce in a judicial declaration that one of its ordinances has affected an unconstitutional taking of property; the landowner has no right under the Just Compensation Clause to insist that a “temporary” taking be deemed a permanent taking.
 

 First Lutheran Church,
 
 — U.S. at-, 107 S.Ct. at 2387.
 

 Finally, the holding of this case should not be taken as an endorsement of Yuba’s “lost profits” damages theory.
 

 Conclusion
 

 The taking was a temporary one. It extended from April 9,1976, to January 29, 1982, and Yuba, in accordance with the cases cited herein, should be compensated on that basis.